# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

William M. Watts,

    Plaintiff,

    vs.

United States of America,
J. Szetela, R. Gupta, C. Ritter,
Melissa Laufenberg, L. Williams II,
and Paul Harvey,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

DOC NO
REC'D/FILED

2019 OCT -8 AM 10: 19

PETER OPPENEER
CLERK US DIST COURT
WD OF WI

## 19 CV 841 JDP

## COMPLAINT UNDER FEDERAL TORT CLAIMS ACT

1.) Plaintiff brings this action against defendant, the United States of America, pursuant to the Federal Tort Claims Act (FTCA), 28 USCS §§ 1346 (b), 2671-2680, and 18 USCS § 4042 (a).

2.) This Court has jurisdiction under Title 28 U.S.C. §§ 1346 (b), and/ or 1331, 1343, 1367.

3.) Venue is proper in this judicial district because the acts and omissions complained of occurred in this judicial district.

4.) Plaintiff's full name is William M. Watts, and at all times relevant to this complaint was/is incarcerated at Oxford F.C.I., Wisconsin.

5.) The plaintiff has complied with all prerequisites to a suit under the Federal Tort Claims Act (FTCA) in that:

    a.) On December 18, 2018, the plaintiff timely filed an admini-strative claim for the matters in dispute in this action in the amount of $5,000,000.00 with the North Central Regional Office, U.S. Department of Justice, Federal Bureau of Prisons. A copy of which is attached to this complaint as Exhibit "A-1".

    b.) The defendant, by and through its agency, the North Central Regional Office, Office of Regional Counsel, denied plaintiff's administrative claim and on May 28, 2019, mailed its notice of denial, a copy of which is attached to this complaint as Exhibit "A-2".

1

c.) This action was timely commenced following the denial of the administrative claim.

6.) Plaintiff also brings this action against defendants, J. Szetela (Safety Manager), R. Gupta, M.D., C. Ritter (P.A., USPHS), M. Laufenberg (HSA, USPHS), L. Williams II (Warden), and Paul Harvey, M.D., medical and institutional staff acting as the agents, servants, and employees of defendant, the United States of America, committed the acts of negligence, breach of duty, deliberate indifference, denial of reasonable safety, failure to intervene, and others that are set forth more fully below.

7.) All defendants have acted under color of Federal and/or State law at all times relevant to this complaint.

8.) As a result of the fault of the defendants, by and through their agents, servants, and employees, acting within the scope of their employment, plaintiff suffered multiple eye conditions, including but not limited to, nerve damage, glaucoma, chronic dry eyes, and photophobia, among other conditions.

9.) These injuries resulted from the negligence of the agents, servants, and employees of defendants, acting within the scope of their employment, as follows:

### STATEMENT OF CLAIM

CLAIM 1
#1 - Denial of Reasonable Safety
#2 - Failure to Intervene
#3 - Breach of Duty
#4 - Negligence
#5 - Deliberate Indifference

Plaintiff is alleging violations of Wisconsin State law, and Constitutional rights, specifically the 8th amendment protection against cruel and unusual punishment. Plaintiff is alleging that he was denied reasonable safety, the right to intervention, the right to a duty owed, subjected to negligence, and a victim of deliberate indifference when defendant's, acting with deliberate disregard and knowing failure to adhere to proscribed safety requirements, allowed plaintiff to come into contact with chemical over-spray. The result of which was a direct and/

2

or proximate cause of plaintiff suffering the serious and dangerous effects of irreparable damage to his eye/vision and neurological systems. And, in addition, physical pain and mental anguish. All of which have significantly and detrimentally affected the quality of plaintiff's ability to perform and enjoy daily life activities.

Plaintiff asserts that defendant's conduct was motivated by careless disregard to his safety and the deliberate indifference associated with the care plaintiff should have been given. Defendant's knew or should have known the perceived dangers that such careless disregard could result in the physical pain and suffering of plaintiff.

1.) At all times relevant to this complaint, plaintiff was/is a prisoner at the Oxford F.C.I., Wisconsin.

2.) The Bureau of Prisons is committed to ensuring the safety of all inmates.

3.) On September 13, 2015, plaintiff was not having any problems with his eyes, or headaches - nor did plaintiff have any history of problems with his eyes.

4.) On September 14, 2015, while participating in a scheduled and designated "inmate movement", plaintiff was sprayed in the face (eyes, nose, mouth) with some type of chemical, being used by a contracted construction company identified as Brazos Urethane, Inc., on the roof of the Oxford F.C.I. education building - directly above the pathway plaintiff had to use to get where plaintiff was going. (No alternate route.) Once plaintiff was able to flush his eyes with water, he did so.

5.) The construction team involved in this incident was responsible for implementing safety measures to ensure protection from chemical over-spray. The Brazos Urethane, Inc. construction team failed to do this, exposing plaintiff to unreasonable danger. The Brazos Urethane, Inc. construction team knew (by standard construction protocol, and standard construction procedure) it was supposed to implement safety measures, as safety is and should be a first priority. The Brazos Urethane, Inc. construction team was deliberately indifferent to the safety, care, and consideration of the Oxford F.C.I. inmate population and employees. The Brazos Urethane, Inc. construction team knew or should have known, prior to plaintiff's injury, that said injury was possible due to their neglect.

3

6.) On September 15, 2015, plaintiff sent an electronic request to the medical staff at Oxford F.C.I., to be evaluated for damages, and listed specific symptoms plaintiff was experiencing. Plaintiff was called to medical on this day, and Dr. R. Gupta did a very basic examination - looking at the surface of the eyeball - relaying to plaintiff that he did not see any surface burns or scarring. He also did not mention anything in relation to enlarged optic nerves after looking at plaintiff's interior eye parts with an ophthalmoscope. Dr. Gupta informed plaintiff that the chemical in question was (supposedly) something labeled "Green Block Prime 100", and (supposedly) non-hazardous to the human condition/body - unless it is being burned. (Copy of Material Safety Data Sheet for Green Block Prime 100 attached as Exhibit "A-3".)

7.) On September 16, 2015, plaintiff sent an electronic message to the "Safety" specialist in charge (J. Szetela) to inquire about potential safety concerns regarding everyone involved, including plaintiff's own J. Szetela did not respond at that time, but assured plaintiff at a later time that the chemical was non-hazardous to the human body when "neutralized" by the air, and that the plaintiff had nothing to worry about. The "Safety" manager knew by standard protocol and standard safety procedure, that she was responsible for ensuring proper safety measures were implemented concerning projects and chemicals inside the institution. The "Safety" manager, through personal involvement in this matter, failed to do this, exposing plaintiff to unreasonable danger. The "Safety" manager knew or should have known that the chemicals being used in this project were hazardous because she should have received the "Safety Data Sheets (SDS)" at least 24 hours prior to the chemical's arrival at the destination address. (See copy of "23.302 Policy" document attached to this complaint as Exhibit "A-4".) By not making sure the Brazos Urethane, Inc. construction team was implementing the proper safety protection for staff and inmates, and allowing plaintiff to be sprayed with hazardous chemicals, J. Szetela (Safety Manager) personally denied plaintiff reasonable safety, failed to intervene on behalf of plaintiff's safety, breached her duty to keep plaintiff safe, was negligent in her duties as Safety Manager, and was deliberately indifferent to the safety, care, and consideration of the Oxford F.C.I. inmate population and employees. The "Safety" manager knew or should have known, prior to plaintiff's injury, that said injury was possible due to her disregard of safety procedures. J. Szetela also

4

informed plaintiff that she had seen "all types" of situations in relation to inmates attempting to question/consider staff inappropriateness/negligence. The statement came off in a way that seemed as if she may have been implying the idea of plaintiff's questions and concerns being ingenuine.

8.) On October 25, 2016, plaintiff had a conversation with an Oxford F.C.I. officer named K. Leach. He informed plaintiff some about the construction company that was working on the roof since the previous year, and claimed OSHA had shut them down 2 or 3 times for non-compliance, and also that the over-spray was causing damage to officer's vehicles in the parking lot of the institution.

9.) On September 22, 2107, plaintiff was in the Lieutenants office at Oxford F.C.I., and eye-witnessed a letter from the U.S. Department of Labor (OSHA) to Mr. Dave Dauman, dated December 2, 2015. It was from Ann Grevenkamp, replying to a request for an investigation of health and safety violations concerning this "roofing project". Findings were that proper measures were **not** implemented to protect employees from roofing sealer over-spray.

5

CLAIM 2

#1 - Delay or Denial of Access to Medical Care

#2 - Improper/Inadequate Medical Care

#3 - Failure to Intervene

#4 - Breach of Duty

#5 - Negligence

#6 - Deliberate Indifference

Plaintiff is alleging violations of Wisconsin State law, and Constitutional rights, specifically the 8th amendment protection against cruel and unusual punishment. Plaintiff is alleging that he was denied adequate medical care, access to medical care, the right to intervention, the right to a duty owed, subjected to negligence, and a victim of deliberate indifference when defendant's, acting with deliberate disregard, refused to provide plaintiff with adequate medical prognosis, diagnosis, and treatment. The result of which caused plaintiff to suffer the serious and dangerous effects of irreparable damage to his eye/vision and neurological systems. And, in addition, physical pain and mental anguish. All of which have significantly and detrimentally affected the quality of plaintiff's ability to perform and enjoy daily life activities.

Plaintiff asserts that defendant's conduct was motivated by careless disregard to his safety and the deliberate indifference associated with the care plaintiff should have been given. Defendant's knew or should have known the perceived dangers that such careless disregard could result in the physical pain and suffering of plaintiff.

1.) At all times relevant to this complaint, plaintiff was/is a prisoner at the Oxford F.C.I., Wisconsin.

2.) The Bureau of Prisons is committed to ensuring the safety of all inmates.

3.) On September 13, 2015, plaintiff was not having any problems with his eyes, or headaches - nor did plaintiff have any history of problems with his eyes.

4.) On September 14, 2015, while participating in a scheduled and designated "inmate movement", plaintiff was sprayed in the face (eyes, nose, mouth) with some type of chemical, being used by a contracted construction company identified as Brazos Urethane, Inc., on the roof of the Oxford F.C.I. education building - directly above the pathway

6

plaintiff had to use to get where plaintiff was going. (No alternate route.) Once plaintiff was able to flush his eyes with water, he did so.

5.) On multiple occasions since the initial incident with the chemical spray, and before the "glaucoma" diagnosis from Dr. Rumery (Ophthalmologist) on November 1, 2017, plaintiff has requested to be seen by medical staff at Oxford F.C.I.. On some of these occasions, plaintiff actually has been seen by a staff member to (seemingly) try to gauge the underlying condition of plaintiff's pain and discomfort. Before November 1, 2017, there had been no official diagnosis, and no progress on getting to the root of plaintiff's eye/headache issues.

6.) On December 9, 2015, (under advisement of Nurse Ritter (PA-C), plaintiff decided to start keeping a "Headache Log" to monitor the frequency of plaintiff's pain and discomfort related to plaintiff's ongoing headaches, eye-aches, and other related issues.

7.) During this same time period (Dec. '15 - Feb. '16) plaintiff was having his blood pressure monitored to determine if his high blood pressure readings were connected to plaintiff's headaches. On February 9, 2016, plaintiff's blood pressure was high, however, plaintiff did not have a headache at that time. Nurse Ritter then excluded that theory as a possibility.

8.) On April 8, 2016, plaintiff was notified that his blood-work came back "normal" for some labs he had taken in March of 2016.

9.) On May 2, 2016, plaintiff sent an updated "Headache Log" to Nurse Ritter.

10.) On May 4, 2016, plaintiff sent an updated "Headache Log" to Nurse Ritter.

11.) On May 23, 2016, plaintiff had his first appointment with the institutions "Eye Doctor" (Optometrist - Mark Kidman, O.D.). He notified plaintiff of an issue involving enlarged optic nerves behind both eyes, and told plaintiff that this is typically a warning sign for "early onset glaucoma". Plaintiff immediately asked Dr. Kidman if he could be evaluated by an outside eye specialist, due to the fact that he had already been going through the previous 8 months in the pain and multiple discomforts he had informed Oxford F.C.I. medical staff of on numerous occasions. Dr. Kidman told plaintiff he was putting plaintiff on call-back for August, 2016. The pressure on plaintiff's eyes was "high" (20) on this initial occasion as well, however, Dr. Kidman did not inform plaintiff of this (or how important this information was) at that time. Nurse Ritter reviewed, and Dr.

7

Gupta signed off on this encounter. Nurse Ritter and Dr. Gupta specifically knew of the previous chemical incident in September, 2015. Dr. Gupta and Nurse Ritter also knew of the ongoing headaches, eye-aches, and other ongoing related problems at that point in time. Dr. Gupta and Nurse Ritter knew of potential "early onset glaucoma" by reviewing Dr. Kidman's notes of this encounter. Dr. Gupta and Nurse Ritter also knew of the progression of the deterioration of the optic nerves by the initial exam right after the chemical incident not showing anything wrong with the optic nerves. Dr. Gupta, Nurse Ritter, and Dr. Kidman had subjective knowledge of the risk to plaintiff's health, and then deliberately disregarded that risk. Dr. Gupta and Nurse Ritter failed to intervene on behalf of plaintiff's health, and along with Dr. Kidman breached their duty to plaintiff's medical needs. Dr. Gupta, Nurse Ritter, and Dr. Kidman were deliberately indifferent to plaintiff receiving adequate/proper medical care and access to medical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. Dr. Gupta and Nurse Ritter knew or should have known, prior to plainitff's injury (progression/worsening of eye conditions), that said injury was possible due to their failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the medical condition. Nurse Ritter, Dr. Kidman, and Dr. Gupta all failed to do this.

12.) On May 27, 2016, plaintiff notified staff of ongoing discomfort since the roof-top chemical incident, and M. Laufenberg (HSA) spoke of the unrelated chemicals the Optometrist had used at plaintiff's previous appointment.

13.) On June 1, 2016, a "memo" was put out to the inmate population giving "notification" that the outside recreation would be closed "for approximately the next 4-5 weeks due to the ongoing roofing project impacting recreation yard operations."

14.) On June 22, 2016, plaintiff contacted "Health Services" to attempt to get some type of shaded lenses to assist with plaintiff's discomfort and pain from sensitivity to light.

15.) On July 14, 2016, plaintiff was notified by M. Laufenberg (HSA) that plaintiff needed "to have a diagnosis from an optometrist for any type of tinted lenses."

16.) On July 22, 2016, plaintiff submitted a request to medical staff requesting an expedited appointment with the "Eye Doctor".

17.) On August 16, 2016, an eye-witness to this incident provided an affidavit, for corroboration and clarity, concerning the chemical over-spray

8

matter.

18.) On August 28, 2016, plaintiff submitted a request to M. Laufenberg (HSA) requesting an appointment with the "Eye Doctor", and addressed the seeming "indifference" shown by medical staff.

19.) On September 14, 2016, plaintiff requested copies of his medical records from S. McKellip (HIT).

20.) On September 26, 2016, plaintiff inquired about his position on the appointment list, and requested to be seen by the "Eye Doctor".

21.) On October 4, 2016, S. McKellip (HIT) notified plaintiff that he had been added to the waitlist.

22.) On October 6, 2016, plaintiff contacted Dr. C. Brieman (Psychology) to discuss issues related to his eye injuries.

23.) On October 11, 2016, a "memo" was put out by W. Armstrong (Supervisor of Recreation) to "notify" the "inmate population" that outside recreation would be closed on October 13th and 14th, "while the roofers are spraying", and inside recreation would be open - as "a temporary measure until the roofers are done spraying."

24.) On October 14, 2016, plaintiff contacted Dr. Svetly (Psychology).

25.) On October 17, 2016, plaintiff was seen by the institutions "Eye Doctor" for the second time. At this appointment, there were the same ongoing symptoms, and the same ongoing "enlarged optic nerves".

26.) On October 20, 2016, plaintiff contacted M. Laufenberg (HSA) to address his issues, and again requested an outside "eye specialist" to evaluate his condition. When an inmate requests a specialist consultation, a standard process for staff to follow is set in place by the F.B.O.P.. This process was not adhered to by medical staff. M. Laufenberg (HSA) knew of plaintiff's ongoing eye issues by the multiple electronic interactions she and plaintiff had previously had. M. Laufenberg had subjective knowledge of the risk to plaintiff's health because plaintiff had explained his situation to M. Laufenberg on multiple previous occasions, specifically requesting that M. Laufenberg assist plaintiff in getting help for his pain and discomfort due to the inaction of the institutions "Eye Doctor". M. Laufenberg deliberately disregarded that risk by not even trying to get to the bottom of this matter. M. Laufenberg failed to intervene on behalf of plaintiff's health, and breached her duty to plaintiff's medical needs. M. Laufenberg (HSA) was deliberately indifferent to plaintiff receiving adequate/proper medical care and access to medical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. M. Laufenberg (HSA) knew or should have known, prior to

9

plaintiff's injury (progression/worsening of eye conditions), that said injury was possible due to her failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the medical condition. M. Laufenberg (HSA) failed to do this. M. Laufenberg (HSA) did not directly respond to this request.

27.) On November 3, 2016, M. Laufenberg (HSA) finally responded to an e-mail plaintiff had submitted on July 22, 2016.

28.) On November 14, 2016, M. Laufenberg (HSA) notified plaintiff that his "concerns have been forwarded to the Optometrist for review."

29.) On March 7, 2017, plaintiff requested information about a supposed visit to an outside "eye specialist", as plaintiff had previously requested. M. Laufenberg (HSA) responded with - there was no appointment for an out-side evaluation/consultation. M. Laufenberg (HSA) knew of the previous chemical incident in September, 2015. M. Laufenberg (HSA) also knew of the ongoing headaches, eye-aches, and other eye related problems at this point in time. M. Laufenberg (HSA) had subjective knowledge of the risk to plaintiff's health, and then deliberately disregarded that risk. M. Laufenberg (HSA) failed to intervene on behalf of plaintiff's health, and breached her duty to plaintiff's medical needs. M. Laufenberg (HSA) was deliberately indifferent to plaintiff receiving adequate/proper medical care and access to medical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. M. Laufenberg (HSA) knew or should have known, prior to plaintiff's injury (progression/worsening of eye conditions), that said injury was possible due to her failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the medical condition. M. Lauf-enberg failed to do this.

30.) On March 7, 2017, plaintiff attempted to send an e-mail to Dr. Svetly inquiring about some information he had previously given to plaintiff concerning an upcoming outside consultation from an "eye specialist", and was notified that he had retired at the end of the previous year.

31.) On March 14, 2017, plaintiff notified M. Laufenberg (HSA) that he was still having ongoing issues with his eyes. She suggested that he would need to report to "sick call" and advised plaintiff of sunglasses for sale at the commissary, even though she had previously advised plaintiff that "policy is no sunglasses inside the institution without a medical diagnosis", on 11/14/2016.

32.) On April 16, 2017, plaintiff informed medical staff of ongoing eye related matters.

33.) On April 28, 2017, plaintiff informed Nurse Perry of "vision" issues.

34.) On May 16, 2017, plaintiff had an appointment with the institutions "Eye Doctor". He informed plaintiff that the pressure on his eyes was "high" (in fact, it was the highest recorded pressure it had ever been while being seen by Dr. Kidman), however, Dr. Kidman still did not refer plaintiff to an outside "eye specialist" at that point - but instead knowingly and intentionally made the decision to ignore plaintiff's pain and discomfort and to put plaintiff on a follow-up in 6 months from that time. Plaintiff then requested a copy of his results, and Dr. Kidman told plaintiff that he should get them from the records office. Paul Harvey co-signed. Paul Harvey and Dr. Kidman specifically knew of the previous chemical incident in September, 2015. Paul Harvey and Dr. Kidman also knew of the ongoing headaches, eye-aches, and other ongoing related pro-blems at that time. Paul Harvey and Dr. Kidman had subjective knowledge of the risk to plaintiff's health and deliberately disregarded that risk by denying plaintiff treatment. Paul Harvey failed to intervene on behalf of plaintiff's health, and both Doctors breached their duty to plaintiff's medical needs. Paul Harvey and Dr. Kidman were deliberately indifferent to plaintiff's receiving adequate/proper medical care and access to med-ical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. Paul Harvey and Dr. Kidman knew or should have known, prior to plaintiff's injury (progression/worsening of eye conditions), that said injury was possible due to their failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the medical condition. Paul Harvey and Dr. Kidman both failed to uphold their responsibilities and duties.

35.) On May 17, 2017, plaintiff, due to a seeming delay or denial of access to medical care, improper or inadequate medical care, failure to intervene, breach of duty, negligence, and deliberate indifference on be-half of Oxford F.C.I. medical and administrative staff, exercised his 1st amendment Constitutional right and initiated his grievance process. (Filed BP-8, Administrative).

36.) On May 31, 2017, plaintiff filed a BP-9 document to Oxford F.C.I. Administration.

37.) On June 13, 2017, plaintiff had a doctor's visit (unrequested) with Dr. King (Region). Plaintiff was put on call-out for this visit by staff, after he pursued "Administrative Action" - stemming from the May 16, 2017, visit with the optometrist. Dr. King (DO/NCR, Master Physician)

reopened the theory of plaintiff's high blood pressure being associated with his eye/headache issues.

38.) On July 17, 2017, M. Laufenberg (HSA) submitted a (fraudulent) "Department Head Documentation Attempt At Informal Resolution" form, wherein M. Laufenberg (HSA) makes false claims against and concerning plaintiff. (Plaintiff requested these fraudulent claims be investigated when he filed his BP-10 appeal to the Regional Director.)

39.) On July 18, 2017, Louis Williams II (in furtherance and support of (A) delay or denial of access to medical care, (B) improper and/or inadequate medical treatment, (C) failure to intervene, (D) breach of duty, (E) negligence, and (F) deliberate indifference) accepted the HSA's assessment of the matter at hand, and concurred with the manner in which M. Laufenberg (HSA) addressed the situation. Louis Williams II knew of the chemical incident in September, 2015, because he is the one who replied to plaintiff's BP-9 document. Louis Williams II also knew of the ongoing headaches, eye-aches, and other ongoing related problems at that point in time. Louis Williams II knew of potential "early onset glaucoma" by reviewing all documents submitted in the BP-9 process. Louis Williams II had subjective knowledge of the risk to plaintiff's health, and then deliberately disregarded that risk. Louis Williams II failed to intervene on behalf of plaintiff's health, and also breached his duty to plaintiff's safety. Louis Williams II was deliberately indifferent and/or negligent to plaintiff receiving adequate/proper medical care and access to medical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. Louis Williams II knew or should have known, prior to plaintiff's injury (progression/worsening of eye conditions), that said injury was possible due to his failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the medical condition. Louis Williams II failed to do this.

40.) On July 24, 2017, plaintiff was again called to medical for a "follow-up" appointment, and was seen by a PA (Physicians Assistant - Witter).

41.) On July 27, 2017, plaintiff filed a BP-10 (Case #904534-A1) Regional Administrative Remedy Appeal, addressing all original concerns and new concerns - stemming from the responses (fraudulent) of HSA Laufenberg and Louis Williams II (Warden), in furtherance and support of (A) delay or denial of access to medical care, (B) improper or inadequate medical treatment, (C) failure to intervene, (D) breach of duty, (E) negligence,

12

and, (F) deliberate indifference.

42.) On August 22, 2017, a response was given from the Regional Director (Sara M. Revell) concurring with the decision of the Warden, and the way he addressed plaintiff's concerns.

43.) On September 9, 2017, plaintiff filed a BP-11 (Central Office Administrative Remedy Appeal) addressing all previous concerns and new concerns - stemming from the Regional Director's response, in further-ance and support of (A) delay or denial of access to medical care, (B) improper and/or inadequate medical care/treatment, (C) failure to inter-vene, (D) breach of duty, (E) negligence, and (F) deliberate indifference.

44.) On October 4, 2017, plaintiff had another visit with the institu-tions optometrist. Plaintiff participated in a another visual fields test, and on this occasion - plaintiff was told that he showed distinct signs of vision loss. Doctor (Optometrist, Mark D. Kidman) informed plaintiff that he would now be seeking a second opinion concerning plaintiff's eye/headache and neurological issues.

45.) Dr. Paul Harvey signed off on plaintiff's test results on multiple occasions, disregarding his oath to always make the most sound ethical choice when faced with a tough decision, failing to intervene on behalf of plaintiff's health, and breaching his duty to plaintiff's medical needs. Dr. Paul Harvey was deliberately indifferent to plaintiff receiving adequate/proper medical care and access to medical care by ignoring the duty to intervene, and/or assist plaintiff with a sense of urgency. Dr. Paul Harvey knew or should have known, prior to plaintiff's injury (pro-gression/worsening of eye conditions), that said injury was possible due to his failure to act. Additionally, deliberate indifference is shown if staff is not competent to examine, diagnose, treat, and/or refer the med-ical condition. Dr. Paul Harvey failed to do this.

46.) On November 1, 2017, plaintiff was finally escorted to an outside eye specialist (Ophthalmologist) - Dr. Rumery. Dr. Rumery (and staff) performed multiple tests on plaintiff (including another visual fields test) and plaintiff was again told that he showed distinct signs of vision loss and continued high eye pressure. Dr. Rumery subsequently diagnosed plaintiff with the eye condition known as "glaucoma". C/O Dunn and C/O Burpee witnessed this visit with Dr. Rumery and staff. Dr. Rumery prescribed two (2) medications for plaintiff - one for the right eye, and one for the left eye. On November 6, 2017, plaintiff had not received medication for the right eye as of that date, due to a denial of use by the F.B.O.P..

13

47.) Plaintiff asserts that November 1, 2017, when he was finally diagnosed with an actual condition and prescribed medication, is when his situation "accrued".

48.) On November 9, 2017, plaintiff was called to Juneau unit to pick up the response from the Office of General Counsel. Ian Connors (Administrator) concurred with the decisions of the Regional Director and the Warden, and the way they addressed plaintiff's concerns, in furtherance and support of (A) delay or denial of access to medical care, (B) improper and/or inadequate medical care/treatment, (C) failure to intervene, (D) breach of duty, (E) negligence, and (F) deliberate indifference.

49.) On November 10, 2017, at approximately 4:45 p.m. - plaintiff went to the Oxford F.C.I. "pill line" to check on the delayed status of plaintiff's prescribed medication for his right eye. Nurse Perry checked her computer, and then gave plaintiff the same medication he has been using for his left eye. Nurse Perry told plaintiff that this is what has now been prescribed for his right eye as well. Plaintiff assumed that the altered prescription came from Dr. Rumery himself.

50.) At the November 1, 2017, visit with the eye specialist (Dr. Rumery) plaintiff was requested to be brought back within 4-6 weeks (or sooner as needed). On December 18, 2017, plaintiff was again escorted to see Dr. Rumery. Assessment was still "Primary Open Angle Glaucoma" (moderate stage), both eyes - but also "Intraocular pressure much improved after starting Latanaprost." Plan was/is "continue Latanaprost qhs both eyes", and also a new prescription for "artificial tears 4 times a day as needed".

51.) In January, 2018, plaintiff attempted to file this claim in the United States District Court, for the Western District of Wisconsin, as a Bivens/Wisconsin State law/Tort against the United States. However, plaintiff had not exhausted his "administrative remedies" and therefore has to refile this claim properly with the United States District Court, for the Western District of Wisconsin at this time.

52.) The plaintiff brings the following action against the United States of America, and other named defendants, acting in its/their official capacities via a Federal Tort Claim.

53.) The plaintiff seeks redress through the Federal Tort Claims Act (FTCA), in upwards of ten million U.S. dollars (10,000,000.00) to be divided as the Honorable Judge sees fit between the two (2) separate claims in this dual purpose action.

54.) The Federal Tort Claim grounds are based on the same data found in

14

paragraphs one (1) through nine (9) in claim number one (1), and paragraphs one (1) through fifty-one (51) in claim two (2) of this document In addition, all exhibits. The grounds are found to be factual and accurate.

55.) Plaintiff has attached documents as exhibits in support of some of the most important allegations in this complaint.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

56.) The plaintiff has gone through the procedure to exhaust his administrative remedies with respect to all claims and all defendant's.

Wherefore, as a proximate and/or direct cause of defendant's acts, plaintiff has suffered serious physical harm and future medical costs and expenses for treatment and care. Plaintiff will continue to suffer serious physical and emotional injuries as a result of defendant's careless disregard for his safety. The dangerous propensities, and reasonably foreseeable damage of exposing plaintiff to physical harm, should have been known to defendant's. The wrongs done by defendant's were aggravated by the kind of unacceptable malice, gross negligence, and deliberate indifference for the rights of those in their custody and care.

Plaintiff will seek, at the appropriate time, under governing law for the imposition of compensatory damages in the amount of $5,000,000.00, in that defendant's conduct whether or not was specifically intended to cause substantial injury including a strong possibility of permanent damage or disfigurement - did cause these injuries, or when viewed objectively from defendant's standpoint involved an extreme degree of risk. Additionally, the mental and emotional distress plaintiff has suffered and endured from this ordeal is not to be discounted.

Plaintiff will also seek, at the appropriate time, punitive damages in the amount of $5,000,000.00, that will punish defendant's for their conduct and which will deter others acting in similar positions from engaging in such misconduct in the future.

Plaintiff files this lawsuit within the applicable statute of limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of fully discovering the wrongful conduct.

Wherefore, plaintiff pursues judgment in his favor and against all named defendant's, jointly and severally for damages in an amount in excess of the jurisdictional limits of this Court together with all lawful fees, costs, any attorney fees incurred, and other such relief as this Court deems just and proper, aside from and in addition to the compensatory and punitive amounts specified above.

**The plaintiff demands that the case be tried by a jury.**

October **04**, 2019

Respectfully submitted,

/s/ _William M. Watts_

William M. Watts,    #18247-026
F.C.I. Loretto
P.O. Box 1000
Cresson, PA  16630