IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WILLIAM M. WATTS,

         Plaintiff,

 v.

UNITED STATES OF AMERICA,

         Defendant.

OPINION and ORDER

19-cv-841-jdp

---

  Plaintiff William M. Watts is proceeding on claims under the Federal Tort Claims Act (FTCA) based on allegations that four Bureau of Prison employees misdiagnosed eye injuries that he developed after being sprayed in the face with a roof-priming chemical. He also alleges that BOP medical staff failed to provide him with proper care for his eye problems. Before the court are defendant's motion for summary judgment, Dkt. 53, and two motions filed by Watts: (1) a motion requesting that the court provide a neutral expert to explain the medical standard of care applicable in this case, Dkt. 50; and (2) a motion requesting that the court recruit counsel to represent him in this case, Dkt. 64.

  This is Watts's second lawsuit arising out of the chemical spray incident. In case number 18-cv-49-jdp, Watts brought Eighth Amendment and negligence claims against a privately employed optometrist and a construction company. That case was resolved at summary judgment in favor of the defendants because Watts failed to submit evidence that the defendants' actions fell below the standard of care and injured him. The only way that Watts could have overcome the evidence presented by the defendants in that case would have been to introduce expert testimony in support of his claims. But Watts was unable to find an expert to support his case, and I denied Watts's requests that the court recruit counsel or an expert

to assist him. I was not persuaded that Watts needed the assistance of counsel to present his case, and I was not persuaded that Watts would have had a viable claim against either defendant even if he'd had the help of an expert. Dkt. 129, in 18-cv-49-jdp.

Watts's claims in this case fail for the same reasons that his claims against the optometrist and construction company failed. He has failed to present evidence from which a jury could conclude that BOP medical staff's treatment decisions fell below the applicable standard of care. And I am not persuaded that the court should recruit counsel or an expert to assist Watts. Therefore, I will grant defendant's motion for summary judgment, and I will deny both of Watts's motions.

UNDISTED FACTS

The following facts are undisputed unless otherwise noted.

From 2014 to 2018, plaintiff William Watts was an inmate at the Federal Correctional Institution in Oxford, Wisconsin. From 2014 until May 2016, Dr. Ravi Gupta, a family practice doctor, was the clinical director of the health services unit at FCI Oxford. From May 2016 until November 2017, Dr. Paul Harvey, an internal medicine doctor, was the acting clinical director at FCI Oxford. Neither Gupta nor Harvey have specialized training in treating eye disease. Cari Ritter was a certified physician's assistant at the prison during the relevant period, and Melissa Laufenberg was a registered nurse and the health services administrator.

On September 14, 2015, Watts was walking outside his housing unit when he felt a chemical spray hit his face. A construction company was working on a roofing project at the prison at the time. The next day, Watts reported to Dr. Gupta that he had been sprayed in the eyes by a roofing chemical, that his eyes were irritated, that he had a headache, and that he

was sensitive to light. He denied having any pain, redness, or changes in vision. Gupta examined Watts's eyes by performing a visual inspection and using a hand-held ophthalmoscope. Gupta also examined Watts's respiratory system. Gupta noted that Watts's eyes were sensitive to light, but that Watts had no burns or scarring, no changes in his vision, no discharge, no pain, and no redness. He also did not find any problems with Watts's respiratory system. Gupta observed that Watts's blood pressure was high, and he submitted an order for Watts to participate in blood pressure monitoring through the blood pressure clinic at FCI Oxford. Gupta also told Watts to return to health services if his condition worsened.

On October 5, 2015, Watts sent an electronic request to be seen in health services for eye problems. Health services scheduled Watts for an appointment to be seen on October 20, but Watts missed the appointment. Watts saw Gupta again on November 3, 2015. Watts complained of eye irritation, "floaters," and eye twitching. Gupta examined Watts's eyes, but did not find any irregularities or problems with Watts's eyes. Watts also saw Gupta on November 16 regarding a different health concern. Watts did not report any problems with his eyes at that appointment.

Watts saw PA-C Ritter on December 7, 2015, for complaints of dry eyes, light sensitivity, occasional blurry vision, involuntary eye movements, and excruciating headaches. Watts told Ritter that he had been managing his headaches with pain relievers, but that he had not tried any of the eye drops available in the commissary for his dry eyes. Ritter examined Watts's eyes, but found no evidence of injury or disease. Ritter instructed Watts to keep a headache log to see if they could detect a pattern for his headaches. She also ordered labs to test for conditions that might be causing his headaches, including blood sugar problems, thyroid disfunction, and anemia. Ritter directed Watts to return for a follow-up in one month

3

to discuss his diet and headache log. She also encouraged Watts to seek an appointment with psychological services to address his stress.

Watts had a follow-up appointment with Ritter on January 13, 2016, at which time his blood pressure was slightly elevated. Watts told Ritter that his headaches were up and down but that he had not had a headache in a week, that he was using aspirin for his headaches, and that exercise sometimes brought on headaches. Ritter reviewed Watts's commissary purchases with him, explaining that high levels of salt and caffeine can raise blood pressure and trigger headaches. Ritter put in an order for Watts to participate in the health services unit's blood pressure clinic for another 30 days. Ritter also told Watts to attend sick call if his condition worsened or he needed additional care.

On February 1, 2016, Watts emailed health services, stating that he had elevated blood pressure that day and had some light sensitivity but no headache. He did not request an appointment. Watts emailed health services again on March 3, stating that he was still having problems with his eyes and wanted the results of his blood work. Health services staff asked Watts if he wanted an appointment, but Watts responded that he did not. Melissa Laufenberg, the health services administrator, emailed Watts on April 22, stating that he would need to be reevaluated if he was still having problems, and that providers could not diagnose or treat him via email. She encouraged him to go to sick call.

Watts came to sick call on April 27, 2016, where Ritter examined him. Watts told Ritter that he felt pretty good, that he did not have any pain or a headache, but that he was wondering about his lab results because he was concerned about diabetes. Watts also requested to see an eye doctor to make sure he did not have any damage from roofing spray. Ritter put in a request for an optometry consult.

4

In May 2016, Watts saw optometrist Mark Kidman. Kidman worked at FCI Oxford approximately once a month on a contract basis. Kidman was responsible for performing optometry services at the prison, including performing eye examinations and treating eye-related problems. Watts told Kidman that he had gotten chemicals in his eyes eight months previously, and that he had experienced light sensitivity and dry eyes since then. Kidman's exam showed normal results, except that Watts's intraocular pressure was near the high end of normal, at 20 mmHg (millimeters of mercury), and that Watts had a large optic nerve cupping both eyes. Kidman told Watts that the large optic nerve could be normal for Watts, or that it could be an early sign of glaucoma. Kidman scheduled Watts to be seen for a follow-up exam in three months.

Watts saw Kidman again on October 17, 2016. Watts's optic nerves were still enlarged, but his eye pressure was lower than it had been in May. Kidman told Watts that the enlarged nerves could be a precursor to glaucoma. But Kidman did not think Watts had glaucoma at the time and he declined to refer Watts to an ophthalmologist. Kidman scheduled Watts for a follow-up in one year. Kidman asked PA-C Ritter to review his treatment notes from both the May and October appointments, which Ritter did. Ritter noted that Watts had been diagnosed with large optic nerves, and she knew that large optic nerves could be congenital or caused by a variety of underlying conditions. Ritter deferred to Kidman's assessment and judgment as to Watts's care because he had a higher level of specialized knowledge about eye conditions than she did.

In June 2016, Watts emailed health administrator Laufenberg to ask for tinted lenses. He stated that Kidman had suggested purchasing both readers and sunglasses from the commissary. Laufenberg responded that sunglasses were not permitted inside the institution

without a medical diagnosis or order. She also stated that Watts should return to sick call if he continued to have headaches after purchasing readers. Laufenberg forwarded Watts's request for sunglasses to Kidman, but Kidman did not put in an order for Watts to wear sunglasses indoors. In October 2016, Watts emailed Laufenberg asking to be seen by an outside specialist due to his enlarged optic nerves. Laufenberg did not have the authority to refer Watts to a specialist, so she forwarded Watts's email to Kidman.

Watts next went to sick call on March 12, 2017, for complaints of pain in his left eye. A nurse recommended compresses, Visine eye drops, and acetaminophen for pain. She told Watts to follow-up as needed and to return immediately if the condition worsened. Watts returned to sick call on April 20, 2017. A nurse noted that Watts reported ongoing redness in his eyes, but denied pain, itching, or vision problems. The nurse moved up Watts's next appointment with Kidman by several months.

Watts saw Kidman again in August 2017. Kidman noted that Watts was experiencing some vision loss, and he referred Watts to an ophthalmologist. Dr. Harvey reviewed Kidman's notes and cosigned them. Watts saw an ophthalmologist in November 2017, who diagnosed glaucoma and chronic dry eyes and prescribed medication to Watts. Watts's symptoms have improved with medication.

ANALYSIS

Watts contends that Dr. Gupta, PA-C Ritter, Dr. Harvey, and health services administrator Laufenberg acted negligently in treating the eye problems that he developed after being sprayed with a roof-priming chemical at FCI Oxford. The FTCA provides the exclusive remedy for certain individuals, including prisoners, to recover for damages caused by the

negligent or wrongful act of a federal government employee. 28 U.S.C. §§ 2671-2680; *Levin v. United States*, 568 U.S. 503, 506–7 (2013). Because Watts was incarcerated at FCI Oxford during the relevant period, Watts's medical negligence claims are governed by Wisconsin law. *See* 28 U.S.C. § 1346(b); *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994). Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999). To prevail on his medical negligence claims, Watts must prove that defendants breached their duty of care by failing to conform to the standard of care, and that Watts suffered an injury as a result. *Carney-Hayes v. Nw. Wisconsin Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 81–82, 699 N.W.2d 524, 537; Wis J–I Civil 1023.

**A. Dr. Gupta and PA-C Ritter**

Watts contends that Dr. Gupta and PA-C Ritter breached their duty of care by failing to respond appropriately to Watts's complaints about eye irritation, dry eyes, headaches, and other symptoms suggesting glaucoma. But the evidence does not support Watts's claims.

Dr. Gupta saw Watts twice for his eye complaints. On both occasions, Gupta examined Watts's eyes and saw no signs of any eye injury or disease. Gupta placed an order for Watts to participate in a blood pressure clinic and instructed Watts to return to health services if he continued to have problems. PA-C Ritter saw Watts three times for his eye complaints. At each appointment, Ritter examined Watts's eyes and saw no signs of eye injury or disease. She noted that Watts's high blood pressure could be causing his headaches, so she directed him to keep a headache log, participate in the blood pressure clinic again, and make changes to his diet. She also ordered labs to rule out potential causes of his symptoms. Watts requested a referred

7

to an optometrist at his third appointment with Ritter, and Ritter submitted the referral. In light of this treatment history, no reasonable jury could conclude that Gupta or Ritter acted negligently in their treatment of Watts.

Watts argues that Gupta and Ritter should have done more to assess and treat Watts's eye problems after Watts reported being sprayed in the face with a roofing chemical. But Watts has submitted no evidence to suggest that Gupta's or Ritter's treatment decisions fell below the medical standard of care for a family medicine doctor or physician's assistant. For example, he has not submitted evidence that the standard of care under the circumstances would require a family doctor or physician's assistant to perform a different type of eye examination, provide a specific type of treatment, or to refer Watts to a specialist despite any visible signs of injury, irritation, or disease.

Watts argues that Ritter should have intervened when she reviewed Dr. Kidman's treatment notes and saw that Kidman was ordering no treatment despite Watts's enlarged optic nerves. But Ritter was not an eye specialist; Kidman was. Watts has not submitted evidence suggesting that a physician's assistant in Ritter's position would have thought that Kidman's treatment decisions were inappropriate or potentially harmful. In addition, Ritter knew that large optic nerves were not necessarily a sign of disease—some people are born with large optic nerves. Therefore, she was not negligent for relying on Kidman's decision to monitor Watts's before making a treatment decision or referring Watts to an ophthalmologist.

Watts also has not submitted evidence that Gupta's or Ritter's actions harmed Watts. After Ritter referred Watts to Dr. Kidman, Kidman monitored Watts's eye condition for more than a year before Watts showed signs of vision loss and was referred to an ophthalmologist for treatment. Even if Gupta or Ritter had referred Watts to a specialist sooner, there is no

8

evidence that Watts's would have received different treatment. For all of these reasons, defendant is entitled to summary judgment as to Watts's negligence claim based on Gupta's and Ritter's actions.

**B.  Melissa Laufenberg and Dr. Harvey**

Neither Melissa Laufenberg nor Dr. Harvey provided medical treatment to Watts for his eye condition. Laufenberg's only involvement in Watts's care was in her role as the health services administrator. In that role, Laufenberg could not prescribe medication or special lenses to Watts, could not refer him to a specialist, and could not override any provider's treatment decision. Laufenberg did respond to Watts's emails by directing him to request an appointment or attend sick call. She also forwarded his complaints to his treating providers. Laufenberg's actions were reasonable, and no reasonable jury could conclude that she breached a duty of care or caused Watts any harm.

Dr. Harvey's only involvement in Watts's care was to review notes prepared by Dr. Kidman about Watts's appointments. Watts argues that Harvey should have intervened and referred Watts to an ophthalmologist sooner, but Watts has produced no evidence that Harvey's failure to do so fell below the standard of care for an internal medicine doctor reviewing an optometrist's treatment decision about eye care. For example, Watts has not submitted evidence suggesting that an internal medicine doctor would question Kidman's treatment decisions under the circumstances.

Accordingly, defendant is entitled to summary judgment on Watts's claims based on the alleged negligence of Laufenberg and Harvey.

C. **Watts's requests for counsel or a neutral expert**

Watts argues that he would be able to prove that defendants acted negligently if the court would appoint a neutral expert to opine about the standard of care applicable to each defendant. But I am not convinced. Rule 706 of the Federal Rules of Civil Procedure allows a court to appoint a neutral expert to help the court or jury interpret complex information and disputed issues. *DeJesus v. Godinez*, 720 F. App'x 766, 772 (7th Cir. 2017). Watts has not identified any complex or disputed issues for which the court would need expert assistance. And the court may not appoint an expert under Rule 706 solely to bolster a party's case for which he would not otherwise have evidence. *Dobbey v. Carter*, 734 F. App'x 362, 364–65 (7th 2018); *Turner v. Cox*, 569 Fed. App'x. 463, 468 (7th Cir. 2014).

Watts also requests that the court recruit counsel to assist him. But as I have explained previously in this case and in Watts's related case, Watts does not need the assistance of counsel to present his case. He has shown that he can gather evidence and present legal arguments better than most pro se litigants can. Counsel might have been able to find an expert willing to support Watts's claims, but I am not persuaded that Watts would have had a viable claim even with the help of an expert. Watts has presented *no* evidence even hinting that any BOP employee's actions fell below the standard of care or caused him harm.

ORDER

IT IS ORDERED that

1. Plaintiff William M. Watts's motion for the court to provide a neutral expert, Dkt.

50, and motion for recruitment of counsel, Dkt. 64, are DENIED.

2. Defendant United States of America's motion for summary judgment, Dkt. 53, is GRANTED.

3. The clerk of court is directed to enter judgment for defendant and close this case.

Entered July 15, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge